IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 28 2007

JAMES N. HATTEN, Clerk
By:

LEJEAN KOGER, Individually and
on behalf of a class of
similarly situated persons,

      Plaintiff,

v.

TEXACO, INC., SHELL OIL
COMPANY, PROTIVA, INC.,
MASHUD M. REZA, BABUL ISLAM,
and all other persons and
entities acting in concert
with the named DEFENDANTS,

      Defendants.

CIVIL ACTION NO.

4:04-CV-205-JEC

## ORDER & OPINION

This case is presently before the Court on the Magistrate Judge's Final Report and Recommendation [72] granting defendants' Motion for Summary Judgment [38]. Plaintiff filed Objections to the Final Report and Recommendation on September 29, 2006 [73]. The Court has reviewed the record and concludes that the Magistrate Judge's Final Report and Recommendation [73] is adopted in part and rejected in part, for the reasons set out below.

## BACKGROUND

Plaintiff, Lejean Koger, filed a race discrimination case under 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). ("Am. Compl."

[6].)[1]  On May 5, 2006, defendants filed a Motion for Summary Judgment (Def.'s Mot. for Summ. J." [38].)   The Magistrate Judge issued a Final Report and Recommendation ("R&R" [72]) granting defendants' Motion for Summary Judgment on September 21, 2006.   Plaintiff filed objections to the R&R on September 29, 2006.   ("Pl. Obj." [73].)

In accordance with 28 U.S.C. § 636(b)(1) and FED. R. CIV. P. 72, the Court has conducted a *de novo* review of the portions of the Magistrate Judge's R&R to which plaintiff has objected, and has reviewed the remainder of the R&R for plain error.   *U.S. v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983).   Plaintiff does not object to the findings of fact or procedural background in the R&R, and having reviewed them for plain error, the Court hereby adopts the facts and procedural background as set forth in the R&R.

---

[1]  At an earlier stage of the litigation, the Magistrate Judge held that even though plaintiff's case style asserted that she was suing "[i]ndividually and on behalf of similarly situated persons" and that the Amended Complaint contained a prayer for leave to proceed as a representative of all similarly situated individuals (Am. Compl. [6] at 11), plaintiff failed to comply with the requirements for proceeding as a class action.  (R&R [72] at 2-3.)

The Magistrate Judge also denied plaintiff's Motion to Amend Complaint [46] seeking to add an FLSA claim and to add a new defendant.  ("July 18, 2006 Magistrate Order" [67].)   Finally, the Magistrate Judge ruled that plaintiff's action did not contain an Age Discrimination in Employment Act ("ADEA") claim, because plaintiff failed to formally assert such a claim.  (R&R [72] at 3.)

AO 72A
(Rev.8/82)

## DISCUSSION

### I. **The Magistrate Judge's Report and Recommendation**

Plaintiff has sued the defendants, alleging that she was demoted from her job position on account of her race.   She has sued defendants Shell, Texaco, and Protiva under both Title VII and § 1981.   She has sued defendants Mashud Reza and Babul Islam under § 1981, only.[2]

All defendants have filed a motion for summary judgment.   In determining whether to grant summary judgment, the same legal analysis applies to both Title VII and § 1981 claims. Defendants Shell and Texaco (collectively hereafter "Shell") have moved for summary judgment on all of plaintiff's claims against them, arguing that neither entity acted as plaintiff's employer at the time of her demotion. (Def.'s Mot. for Summ J. [38] at 4-10.) All defendants have moved for summary judgment on the race discrimination claims against them, contending that plaintiff has failed to demonstrate that their stated non-discriminatory reasons for demoting her were a pretext to hide racially discriminatory motives.

The Magistrate Judge recommended granting summary judgment for Shell and Texaco, concluding that neither had acted as plaintiff's

---

[2]   Title VII allows suit only against an employer; individual employees cannot be sued for discriminatory acts.   Such employees can, however, be sued under § 1981 for certain racially discriminatory acts.

3

"joint" or "single" employer when Protiva demoted plaintiff. Accordingly, neither defendant could be found liable for any alleged violations of Title VII or Section 1981.   Specifically, the Magistrate Judge concluded that Shell had maintained an insufficient amount of control over employees at the Ringgold Station--the station that employed Koger-and that Shell and Protiva were not sufficiently interrelated so as to be considered joint or single employers.

As to defendant Protiva, who was clearly plaintiff's employer, and as to the individual defendants, Reza and Islam, the Magistrate Judge recommended that summary judgment be granted as to all three defendants.   The magistrate judge concluded that plaintiff had fulfilled her initial burden of establishing a *prima facie* case of discrimination (R & R [72] at 37), but had failed to present evidence sufficient to show that defendants' two legitimate, non-discriminatory reasons for the decision to demote Koger were pretextual.   (*Id.* at 40.)   The Magistrate Judge further concluded that plaintiff's statistical evidence could not support a "pattern and practices" claim of discrimination. The Magistrate Judge finally held that plaintiff could not assert a retaliation claim because plaintiff had formally asserted this claim for the first time in her Response to Motion for Summary Judgment.   ("Opp'n to Mot. for Summ. J." [49] at 18; 23-25.)

4

## II. **Plaintiff's Objections to the Magistrate Judge's Recommendation that Summary Judgment Be Granted to Defendants on the Merits of the §1981 Claim and Title VII Claim**

Plaintiff objects to the Magistrate Judge's determination that the race discrimination claims under § 1981 and Title VII be dismissed as to all remaining defendants.[3]  Plaintiff contends that the record contains both direct and circumstantial evidence of race discrimination.

### A. **Plaintiff's Objections Concerning Direct Evidence of Discrimination**

In her opposition to the Magistrate Judge's R&R, plaintiff argues that she proffered direct evidence of race discrimination, and that the Magistrate Judge erred when he examined plaintiff's circumstantial evidence under the burden-shifting *McDonnell Douglas* framework, without considering this direct evidence.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

As evidence of direct discrimination, plaintiff points specifically to two comments made by current and former employees of defendants.  Yet, neither comment was related to the decision to demote plaintiff nor was either statement made by a decisionmaker. Under Eleventh Circuit law, statements by non-decisionmakers cannot

---

[3]     As noted by the Magistrate Judge, the individual defendants, Reza and Islam are only potentially liable under a §1981 claim, not a Title VII claim.  The analysis of the merits is the same as to both claims.

AO 72A
(Rev.8/82)

be considered direct evidence of age discrimination. *See Eskra v. Provident Life & Accident Ins. Co.*, 125 F. 3d 1406, 1411 (11th Cir. 1997) (a statement by a person who did not play any part in the adverse personnel decision is not direct evidence of discrimination (internal citations omitted); *Hutchinson v. AT&T Commc'n. Inc.*, No. 1:88-CV-2191, 1991 WL 330911 at *10 (N.D. Ga. Aug. 29, 1991) (statements by non-decisionmakers cannot satisfy plaintiff's burden of proving discrimination by direct evidence).

Specifically, Earl Reeves, a manager of the Ringgold Station until 2003, made one of the statements in issue. (Koger Dep. at 30:8-10). According to Koger, Reeves said it was his belief that Protiva had "no intention of keeping any of the managers or employees that were currently there" and that they would be replaced by "Pakistanis and people of their own dissent [sic]. " (*Id.* at 87:3-18.) However, Koger contends that her employer demoted her in March 2004 (*id.* at 46:17-20), at a time when Reeves was no longer employed. Accordingly, Reeves necessarily could have had no role in the decision to demote plaintiff, and, thus cannot be considered a decisionmaker.

Second, plaintiff cites a comment made by Mashud Reza, an owner of Protiva, to Israil at the time that Reza hired Israil. According to Israil's testimony, Reza stated that "since we [Reza and Israil] are from the same country, I was told at the beginning if he can make

6

little money, maybe I can get little as profit."[4]   (Israil Dep. at 6:4-9.)   Though the record indicates that Reza was an owner of Protiva (Israil Dep. at 5:25-6:1), there is no evidence that he played any role in the decision to demote Koger.   Koger states that both Mojib Rahman and Babul Islam "took me back to the office and they told me that they thought that it would be better if Moni was the manager and I would be his assistant."   (Koger Dep. at 46:19-47:3.)   Because plaintiff does not offer any evidence indicating that either Reza or Reeves had any involvement in the decision to demote plaintiff, these comments do not constitute direct evidence of discrimination.   In addition, even if Reeza was a decisionmaker, statements made by decisionmakers unrelated to the decisional process are not direct evidence of discrimination.   *Stone v. Galaxy Carpet Mills, Inc.*, 841 F. Supp. 1181, 1185 (N.D. Ga. 1993) (statements by decisionmakers unrelated to the decisional process do not constitute direct evidence) (internal citation omitted).

**B.   Plaintiff's Objections Regarding Evidence of Pretext**

      1.   Background

Plaintiff also objects to the Magistrate Judge's finding that plaintiff failed to demonstrate sufficient evidence of pretext under

---

    [4]   The Court is not even clear what this statement means or whether it is a recruiting pitch or a statement suggesting a discriminatory state of mind.   The ambiguity of the statement also disfavors consideration of it as direct evidence of discrimination.

AO 72A
(Rev.8/82)

the *McDonnell Douglas* framework.   Under *McDonnell Douglas*, a plaintiff must make out a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802.   Where the alleged adverse action is an unlawful demotion, plaintiff must demonstrate the following to make out his/her *prima facie* case: (1) she is a member of a protected class; (2) she was qualified for the position she occupied; (3) she was demoted; and (4) she was replaced by someone who is not a member of her protected class.   *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).

If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant employer to articulate one or more legitimate, non-discriminatory reasons for the adverse employment action.   *Id.* If the employer meets this burden, the burden shifts back to plaintiff to present evidence, which may include evidence previously presented at the *prima facie* stage, "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."   *Id.* at 1024.   If a plaintiff cannot present evidence sufficient to raise a genuine issue of material fact concerning whether each of defendant employer's reasons is a pretext, defendant employer is entitled to summary judgment.   *Id.*

The Magistrate Judge concluded that plaintiff had established a *prima facie* case, but he further determined that the plaintiff had

8

failed to show that the defendants' proffered nondiscriminatory reasons for the demotion were pretextual.  Plaintiff argues that the evidence in the record is sufficient to create a material issue of fact as to whether the defendants' motivations were as claimed or, instead, were pretexts for a desire to demote plaintiff because of her race.  She notes that the defendants have offered shifting explanations for their demotion of her, as well as inconsistent testimony about whether she was even demoted. *See* Obj. to R&R [73] at 5.) (the Key Management Person for defendants testified that the plaintiff had never been demoted, which was contradicted by the General Manager's testimony that the defendants had, in fact, demoted her.  Citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286 (11th Cir. 2006), plaintiff contends that "an employer's failure to articulate clearly and consistently the reason for any employee's discharge may serve as evidence of discrimination."

With regard to defendants' claim that they demoted plaintiff because she had  an unacceptable level of cash shortages, plaintiff notes that the defendants admit that they did not document any such shortages in writing nor follow their own internal policies for disciplining an employee.  That is, they did not give plaintiff any warning about the problem and plaintiff avers that they never even spoke to her about their purported concerns while she was a manager. *Id.* at 6-8.

9

Plaintiff also contends that other managers of the same ethnicity as the defendants--that is, of Bangladeshi or Southeastern Asian Indian descent--had more severe cash shortages than did plaintiff, yet the defendants never demoted these individuals. (Obj. to R&R [73] at 8-11). This evidence of disparate treatment, according to plaintiff, is sufficient to defeat defendants' motion for summary judgment. For the reasons explained below, the Court agrees and, because it concludes that this evidence is sufficient to warrant the denial of summary judgment, it does not further address the other grounds advanced by plaintiff, *supra,* in support of her objections to the R&R's recommendation that summary judgment be granted.

> 2.    Evidence of Disparate Treatment of Plaintiff With Regard to Overages and Shortages

Defendants have offered two primary reasons for their decision to demote the plaintiff: (1) she had numerous cash shortages/overages for a few days while she was manager and (2) she had been unable to increase inside sales, as they would have liked for her to do.[5] The Court addresses the first explanation for demoting the plaintiff and the evidence that she has offered which casts doubt on this

---

[5]    The cash shortage claim has been the explanation discussed most throughout the litigation. Defendants' claim that plaintiff's sales were inadequate has not been advanced with enough precision for the Court to understand what standards the defendants were applying in assessing the appropriate level of sales or the extent of the plaintiff's deficiency in that regard.

10

explanation.

In considering defendants' explanation that it had demoted the plaintiff because she had an unacceptably high number of cash register overages and shortages for which she could not account, the Magistrate Judge noted that "[a]lthough Koger managed several weeks in which the overages and shortages were within the acceptable range, there were numerous days during her management tenure in which the overages and shortages exceeded one hundred dollars per day . . . When confronted, Koger was unable to give her supervisors an acceptable explanation for the discrepancies."  (R&R [72] at 39.)

The Magistrate Judge correctly concluded that, taken by itself, the above constituted a neutral, non-discriminatory reason for demoting plaintiff.  The Magistrate Judge further concluded that the plaintiff had not proffered sufficient evidence to suggest that defendants' reasons were pretextual.  Specifically, the Magistrate Judge noted that the plaintiff's evidence of overages/shortages by other managers was not systematically presented, as she had failed "to present full and complete records of any of the Bangladeshi managers to support her claim" that her own overages/shortages were minimal in comparison.  *Id.* at 42-43.  Instead, plaintiff's records seemed to be "random samplings of those managers' weekly totals," from which one cannot discern whether the records offered "are representative of their performance over several months or,

11

alternately, if those reports are from weeks in which the managers had the greatest cash register discrepancies." *Id.* at 43.

The Court agrees that plaintiff's evidence of the various managers' histories of overages/shortages ["hereinafter, "cash discrepancies"] is hardly a model of clarity,[6] but neither is the same sort of evidence presented by defendants to document the plaintiff's own alleged record of discrepancies. Without a forensic accountant, it is impossible for the uninitiated to make much sense of any of these records. To the extent that the Court must identify which one of the parties should be faulted for vagueness in extrapolating performance from these records, it is the defendants who must draw the negative inference, as it is the defendants who created the vague standard of performance that the plaintiff allegedly did not meet.

Specifically, in their motion for summary judgment, the defendants offered only a very sketchy assessment of plaintiff's alleged cash deficiencies, stating that there was "clear evidence of the abnormal cash overages and shortages that occurred on her watch." (Mot. Summ. J. [38] at 13.) The defendants supported this assertion

---

[6]    Plaintiff contends that defendants are in no position to criticize the clarity of plaintiff's presentation of this documentary evidence, as defendants had consistently violated their discovery obligations to produce the documents, which had been the subject of numerous requests and a motion to compel, and as defendants did not finally turn over these documents until the day that plaintiff's response to defendants' motion for summary judgment was due. (Pls.' Objs. to R&R [73] at 9-10).

12

with the Affidavit of Mojib Rahman, who stated that management had demoted plaintiff, in part, "because the cash over/shortage figures during the times she served as manager contained abnormal discrepancies." (Aff. of Rahman [39] at ¶ 3). Rahman goes on to state that these discrepancies could be seen in the chart setting out plaintiff's record on these matters and "particularly during the week of February 16th...." . *Id.* The Chart to which Rahman refers is a daily chart, with a weekly tally, of 33 different pieces of financial information concerning the store and covering the period of February 16-April 4. (Dep. Ex. 2, Koger's Deposition). At no point in this litigation have defendants ever made clear how they determined when a level of discrepancies was sufficiently "abnormal" to warrant disciplinary action.

In her Supplemental Response [69] to the defendants' Motion for summary judgment, plaintiff cites to the records of her Bangladeshi successor and six other managers of Bangladeshi descent who were employed by the defendants at the same time as the plaintiff.[7] Plaintiff notes that, upon a comparison of the her record with these

_____

[7]   Plaintiff explains that she was unable to present this comparison in her original response to the motion for summary judgment because the defendants had failed to present these records during the discovery period, notwithstanding plaintiff's multiple requests for them, and had instead only provided plaintiff with records of comparators after her response to the motion for summary judgment had been filed. (Pl.'s Supp. Resp. [69] at 4-5)

13

Bangladeshi managers, "[p]laintiff's minimal cash overages and shortages do not even began (sic) to compare to the multi-thousands of dollars in overages and shortages originating in stations managed by persons of Indian descent and from Bangladesh, and especially to the overages and shortages incurred by her Indian/Bangladesh replacement....[Yet, plaintiff] was the only one demoted, or even disciplined, for the shortages." (Supp. Resp. [69] at 4.)

In reply to plaintiff's contention that Bangladeshi comparators had substantially worse records for overages and shortages than did the plaintiff, the defendants make no effort to dispute plaintiff's assessment. Thus, the record before the Court indicates that as to one of the defendants' primary reasons for demoting the plaintiff-- her unacceptable level of overage/shortages--several other Bangladeshi mangers had substantially worse records, but were never demoted.

Unless an explanation exists for such a disparity, the latter is probative evidence that the employer's stated reason for demotion was a pretext for racial discrimination. Here, the defendants' effort to explain the disparity is quite unpersuasive and, indeed, almost non-existent. Specifically, defendants fault plaintiff for not presenting "the particular circumstances surrounding each instance of overage and/or shortage" and note that the fact that other managers had a worse record "does not at all rule out that other managers *may*

14

have been reprimanded for such mistakes or had a good explanation for their particular overages or shortages but were kept because of their ability to maintain higher inside sales (unlike the Plaintiff)...." (Defs.' Reply [71] at 14) (emphasis added).

Of course, in any human endeavor, anything is possible and all sorts of things may have happened. Defendants, however, have not offered any evidence, or even claimed, that any of these hypothetical scenarios ever occurred. If a Bangladeshi manager had been reprimanded[8] or had an explanation for his own financial discrepancy or had better sales than the plaintiff, defendants would be the parties who should know that, not the plaintiff. As defendants failed to even turn over these comparator records until after discovery was over and the plaintiff had filed her first responsive pleading, defendants are hardly in a position to fault the plaintiff for not being conversant on all the ins and outs of the employment records of these other comparators. Moreover, to the extent that defendants throw out the possibility that other managers may have better explained their discrepancies than did the plaintiff, the plaintiff has averred that the defendants never spoke to her about any financial discrepancy prior to demoting her. Hence, assuming

---

[8]     Of course, if a comparator had been merely reprimanded, and not demoted, for a more egregious financial discrepancy, defendants would still be deemed to have engaged in disparate treatment.

15

plaintiff's averment to be true, as the Court must, plaintiff cannot be faulted for an inadequate explanation if none was ever sought by the defendants.[9]

In short, the Court concludes that plaintiff has presented adequate evidence of pretext to warrant denying the defendants' motion for summary judgment as to plaintiff's claim of discriminatory demotion that is premised on a disparate treatment theory.

## III. **Plaintiff Failed to Properly Include A Claim for Retaliation**

Plaintiff also objects to the Magistrate Judge's dismissal of her retaliation claim. Plaintiff alleges that her retaliation claim survives because, under Eleventh Circuit precedent, the scope of a judicial complaint is defined by the scope of the EEOC investigation that "can reasonably be expected to grow out of the charge of discrimination." *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988).

Though the contours of a complaint are guided by the scope of the EEOC investigation that "can reasonably be expected to grow out of the charge of discrimination," a plaintiff cannot avoid the procedural requirements of formally asserting her allegations in a

---

[9] Defendants also noted in their Reply that "at least one manager from Bangladesh *was* let go due to cash shortage problems." (Defs.' Reply [71] at 14) (emphasis in original). That defendants may have treated plaintiff as harshly as one comparator does not eviscerate the existence of pretext if they also, without good reason, treated her more harshly than other comparators.

AO 72A
(Rev.8/82)

complaint, prior to a motion for opposition to summary judgment. *See*
*Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir.
2004) (per curiam) (liberal pleading standard does not allow
plaintiff to raise a new claim at the summary judgment stage). The
scope of a complaint is limited to the EEOC charge because the EEOC
would have had no opportunity to investigate or attempt conciliation
of grievances that are not identified. *Cabiness v. YKK (USA), Inc.*,
859 F. Supp. 582, 586-87 (M.D. Ga. 1994) (internal citations
omitted). Thus, the requirement that plaintiff first file an EEOC
charge serves to limit the scope of plaintiff's complaint, but does
not relieve a plaintiff of her duty to raise any and all claims in
her complaint.

Moreover, the defendants would suffer great prejudice if
plaintiff were permitted to raise a retaliation claim at this late
date. A complaint puts a defendant on notice as to what a plaintiff
is claiming and permits the defendant to focus its attention in
discovery on those issues. It would be a waste of time and resources
to force defendants to take discovery on all conceivable issues
raised in plaintiff's EEOC charge, but not alleged in her complaint.
Here, discovery would have to begin anew and defendants would have to
file a new motion for summary judgment, if plaintiff were allowed to
raise this tardy claim.

Plaintiff also argues that she preserved her retaliation claim

17

by raising it for the first time in the parties' Joint Preliminary Report and Discovery Plan ("Joint Report" [73-2] at 14.) Even if plaintiff had laid out facts in the Joint Report that were sufficient to put defendants on notice that she was considering making a retaliation claim, plaintiff still was required to include such an claim in a properly-filed complaint.  Just as her EEOC charge may not act as a substitute for a complaint, the filing of her Joint Report does not relieve plaintiff of the duty to file a complaint setting forth a short and plain statement of her allegations. *See Conley v. Bostic*, 1993 WL 741854 (N.D. Ga. December 28, 1993) at *16 noting that "inclusion of claims in the pretrial stipulation, the mention of them in discovery and the filing of motions concerning those claims [are] not a substitute for the factual allegations of a complaint..." (internal citation and quotation omitted).

In short, plaintiff's complaint is limited by her EEOC charge, but not expanded.  Moreover, plaintiff may not use her EEOC charge as a substitute for a formal complaint.   To allow plaintiff to do otherwise would circumvent the purpose and rationale of FED. R. CIV. P. 8(a).   Thus, the Magistrate Judge properly refused to consider plaintiff's late-mentioned retaliation claim.

**IV.   Plaintiff's Objections Regarding Shell's Status as a Joint Employer**

The Magistrate Judge concluded that Shell was neither a "single

18

employer" nor a "joint employer."   Further, the Magistrate Judge
concluded that the question whether Shell and Protiva were involved
in a "joint venture," which both parties, but particularly the
defendants, had focused on, was not the question to be asked in a
Title VII case, as the latter looks to who is an "employer." (R&R
[72] at 31 n.22) The plaintiff does not appear to be objecting to the
Magistrate Judge's observation about the inaptness of the concept of
joint venture to the analysis here.   The Magistrate Judge's
discussion of the "single employer" theory was thorough and well-
reasoned, and the plaintiff likewise does not appear to object to the
Magistrate Judge's conclusion that Shell was not a single employer.[10]
Accordingly, the Court adopts the Magistrate Judge's conclusion that
Shell and Protiva are not a single employer and that their purported

---

[10]   The Eleventh Circuit applies a non-dispositive four-factor
test to determine whether multiple entities should be treated as a
single employer. *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d
930, 933 (11th Cir. 1987).   The four factors are: (1) interrelation
of operations; (2) centralized control over labor relations; (3)
common management; and (4) common ownership and financial control.
*Id.*

Here, plaintiff argues that defendant acted as her employer
because "Shell retained almost total control over the station's
employees."   (Opp'n to R & R" at 2.)   Because plaintiff does not
raise any argument regarding Shell's interrelation, common ownership
or financial control, the Court concludes that plaintiff did not
object to the Magistrate Judge's ruling regarding Shell's status as
a single employer.   Furthermore, the Court has reviewed the record
and agrees that Protiva and Shell do not appear to meet the
requirements of interrelationship, as set forth in *McKenzie v.
Davenport-Harris Funeral Home*, 834 F.2d at 933.

AO 72A
(Rev.8/82)

status as joint ventures does not determine whether Shell is an employer, for Title VII purposes.

Plaintiff does object to the Magistrate Judge's conclusion that Shell was not a joint employer, however.  Plaintiff asserts that Shell maintained a sufficient amount of control over the working conditions of employees at the Ringgold Station to be considered a joint employer.  (Opp'n to R & R at 2 "Shell retained almost total control over the station's employees.")  Plaintiff cites the following provisions from the CORO Agreement and Lease Agreement--the two Agreements that governed the relationship between Shell and Protiva--as evidence that defendant maintained a sufficient amount of control over the working conditions to be deemed her employer:

- A requirement that Shell employees be able to communicate in English.  (CORO Agreement § 11(a).)
- A requirement that all employees pass a pre-employment drug screening test.  (Lease § 13.)
- A requirement that all Shell facilities receive proper training with respect to the practices contained in the Site Operations Manual.  (Site Operations Manual "Shell Brands & CVP"; "Def.'s Resp. to PSAMF" [71] at ¶ 36.)
- A requirement that Protiva "[k]eep the [Ringgold Station] neat, clean, safe and orderly" and that employees "[w]ear neat and clean uniforms and nametags of a type and style designated by [Motiva][11], and obtained from a vendor approved by [Motiva]."  (CORO Agreement, § 5(c)(3) and (4).)
- A prohibition on employees smoking in any area except those designated by Motiva as a smoking area.  (Id. § 11(g).)
- A requirement that Motiva inspect Protiva's locations on a

---

[11]   For purposes of this discussion, the Court uses "Shell" and "Motiva" interchangeably.

regular basis to ensure compliance with the company's standards as set forth in part in the "blue book" Operations Manual. (Def.'s Resp. to PSAMF at ¶ 24.)

- Requirements that employees in the Ringgold Station "[r]ender fair, courteous and efficient service to retail customers..." (CORO Agreement, § 5(c)(1)); that employees follow a three-step recovery process so that customers leave happy; and that employees follow certain instructions when the "power is down" or when fuel dispensers are "out of product." (PSAMF at ¶ 38; Def.'s Resp. to PSAMF at ¶ 38.)

- A prohibition against installing signs on or visible from the exterior without Motiva's prior approval. (Lease § 7(a).)

- A requirement that Protiva provide the services specified in the CORO Agreement 24 hours a day, seven days per week. (CORO Agreement § 5(a).)

- A requirement that Protiva perform all maintenance required by the Agreement, and that Motiva perform all maintenance deemed necessary or desirable. (Id. at § 13(a).)

- A requirement that Motiva pay all real estate taxes and sales and excise taxes on the Motor Fuel products sold. (Id.)

- A provision in the Operations Manual providing for a regular on-site "Evaluation Process", which monitors the transaction between the customer and the store employees. (Site Operations Manual, "Shell Brand Standards & CVP," p. 1.; Def.'s Resp. to PSAMF at ¶ 37.) (Likewise, defendant concedes that it inspected the covered locations on a quarterly basis.) (Def.'s Resp. to PSAMF at ¶ 43.)

- A requirement that Protiva employees and individuals on the company's premises, be subject to reasonable searches. (Id. at § 11(f).)

- A requirement that Protiva provide access to Motiva to examine and copy employee records "that may in [Motiva's] opinion be relevant to determining [Protiva's] compliance with the [Fair Labor Standards Act] and/or [the Employer Compliance Program] at any time. (Def.'s Resp. to PSAMF at ¶ 30.)

- A provision allowing Shell to delete or add covered locations in its sole discretion, on thirty days' notice and subject to certain conditions. (CORO Agreement § 1(b).)

Although plaintiff acknowledges that Protiva has the most direct

21

day-to-day supervisory influence over its employees, plaintiff contends that Shell's power to control the terms and conditions of these employees is not insignificant. Plaintiff notes that Shell has certain training requirements and directives regarding an employee's interaction with customers, including scripted responses to certain customer questions. Plaintiff further notes that Shell has reserved to itself the right to conduct a regular, on-site evaluation process in which it monitors performance by store employees and that, in fact, Shell does regularly inspect the store. In addition, Shell requires that Protiva make its employee records available to Shell so that the latter can gauge compliance with the FLSA and the Employer Compliance Program at any time. Finally, although Protiva has the sole right to hire and a right to terminate employees, Shell has the right to insist that Protiva terminate promptly any employee that Shell designates and for which cause exists to support the termination.

As this Court noted in its Order of March 28, 2007 in the related case, *Taylor v. Texaco, Inc.*, 4:04-CV-212-JEC, it may well turn out that this Court ultimately concludes that Shell exerted insufficient control over Protiva employees to warrant a conclusion that it was a joint employer. *Taylor* Order, *Id.* at 12-15. Yet, as noted in the *Taylor* order, Shell has not even attempted to respond to the plaintiff's argument that, based on the above factors,

22

Shell exerted sufficient control to be deemed a joint employer. Instead, in reply to these above-cited arguments made by plaintiff in her response brief, Shell ignored these arguments and just keeps talking about whether Shell was a joint venturer with Protiva.

The Magistrate Judge did a commendable job of researching and analyzing a ground for summary judgment with scant assistance from the party that had advanced the ground as a basis for summary judgment. As noted, this Court may well ultimately agree with the Magistrate Judge's conclusion. Yet, as this Court has decided to deny summary judgment on the merits of the Title VII claim, there will be a trial, unless settlement first occurs. Given the weakness of Shell's briefed position on this point and its failure to dispute plaintiff's arguments that Shell was a joint employer, it would be imprudent to allow Shell to be removed as a defendant from the action at this point, as a contrary decision by an appellate court that Shell was a joint employer would then require a second trial. Accordingly, the Court **DENIES WITHOUT PREJUDICE** Shell's motion for summary judgment on the ground that it was not an employer of the plaintiff's.[12]

---

[12] Another problem arises, however, that is totally the creation of plaintiff. That is, although this Court and the Magistrate Judge have referred to "Shell" as the party that contracted with Protiva, in reality, the contracting entity was Motiva, which is a limited liability company that Shell utilizes to engage in contracts with station operators. (Motiva is, itself, a refining and marketing

23

### CONCLUSION

For the foregoing reasons, the Court **ADOPTS** in part and **DECLINES** in part the Magistrate Judge's Final Report and Recommendation [72]. Instead, the Court **GRANTS** in part and **DENIES** in part the defendant's Motion for Summary Judgment [38].

Specifically, the Court **DENIES** Defendants Shell Oil and Texaco's Motion for Summary Judgment [38] as to their status as an employer. The Court **DENIES** all defendants' Motion for Summary Judgment as to plaintiff's § 1981 and Title VII claims alleging disparate treatment as a result of plaintiff's demotion.[13] The Court **GRANTS** all defendants' Motion for Summary Judgment as to plaintiff's retaliation "claim."

The Court will issue a separate Order concerning a trial date, the date by which the pretrial order must be filed, and a date, and process, by which the parties determine if the case can be resolved

---

joint venture between Shell and affiliates of an entity called Saudi Aramco).

The plaintiff did not name Motiva as a defendant in the action, however, and the Magistrate Judge denied an untimely motion by plaintiff to add Motiva as a defendant. Accordingly, even if Shell remains in the action through verdict, there is uncertainty about the plaintiff's ability to obtain a viable judgment against Shell, given that it was not the entity that contracted with Protiva.

[13] As noted, the individual defendants may remain as defendants only as to the § 1981 claim.

24

through a settlement.

    SO ORDERED, this _28_ day of March, 2007.

                                 JULIE E. CARNES
                                 UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)